In re DOYLE.

(District Court, W. D. New York. September 16, 1912.)

No. 3,036.

1. BANKRUPTCY (§ 91*)—PREFERENTIAL TRANSFERS—INSOLVENCY—EVIDENCE.

Evidence *held* to sustain a referee's finding that the bankrupt was insolvent at the time he made a preferential transfer of certain of his property to his wife.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 137–139; Dec. Dig. § 91.*]

2. BANKRUPTCY (§ 408*)—DISCHARGE—DENIAL—FALSE OATH.

A bankrupt's discharge would not be denied on the ground that he made a false oath, that he did not in the year 1908 transfer any property to his wife, where it appeared that before the completion of his examination, he explained that he had testified inadvertently and mistakenly regarding such transfer, and that it had not been his intention to testify falsely.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 732–736, 759, 762, 763; Dec. Dig. § 408.*]

3. BANKRUPTCY (§ 408*)—DISCHARGE—CONCEALMENT OF ASSETS.

Where, after adjudication, the bankrupt continued his business as agent for his wife, and the receiver sold him some of the stock on hand, and there appeared a tacit acquiescence by the receiver that the bankrupt should use certain wax paper, cartons, etc., with the understanding that the wife should pay therefor, the bankrupt would not be denied a discharge on the ground that he had concealed such material from his trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 732–736, 759, 762, 763; Dec. Dig. § 408.*]

4. BANKRUPTCY (§ 408*)—DISCHARGE—CONCEALMENT OF ASSETS.

A bankrupt, on the day before the filing of his petition in bankruptcy, assigned his equity in certain pledged collaterals to his attorney, and these and certain money on deposit in a bank were not scheduled. The pledgee satisfied its claim out of a part of the collaterals, and afterwards the attorney tendered a conditional assignment to the trustee. *Held*, that the bankrupt's explanation that the assignment was made merely to enable the attorney to collect the surplus after satisfying the pledge was insufficient to relieve him from the charge of concealment of assets, which was sufficient to bar his discharge.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 732–736, 759, 762, 763; Dec. Dig. § 408.*]

5. BANKRUPTCY (§ 180*)—TRANSFER OF ASSETS—PREFERENCE—FRAUD.

Where a bankrupt transferred to his wife an undivided interest in certain warehouse property within four months of bankruptcy to secure her as a creditor, the transfer would be regarded as preferential, as distinguished from a fraudulent transfer, to which latter the element of intent to defraud is essential.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 252; Dec. Dig. § 180.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. BANKRUPTCY (§ 414*)—FRAUDULENT TRANSFER—DISCHARGE—"CONCEAL."

Evidence *held* to sustain a referee's finding that a transfer by the bankrupt of certain stock in a corporation to his wife was antedated and was fraudulently made with intent to conceal the stock from his trustee, justifying denial of a discharge, the word "conceal" with reference to the concealment of assets by a bankrupt in Bankr. Act July 1, 1898, c. 541, § 1, subd. 22, 30 Stat. 544 (U. S. Comp. St. 1901, p. 3419), being given a broad meaning.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 720–722; Dec. Dig. § 414.*

For other definitions, see Words and Phrases, vol. 2, pp. 1377–1384.]

7. BANKRUPTCY (§ 414*)—DISCHARGE—OFFENSES—WEIGHT OF EVIDENCE.

While a bankrupt cannot be convicted of an offense involving punishment by imprisonment, as provided by Bankr. Act July 1, 1898, c. 541, § 29, 30 Stat. 554 (U. S. Comp. St. 1901, p. 3433), except on evidence establishing his guilt beyond a reasonable doubt, a fair preponderance of evidence is sufficient to establish a fraudulent concealment of assets to bar the bankrupt's discharge.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 720–722; Dec. Dig. § 414.*]

8. APPEAL AND ERROR (§ 1019*)—FINDINGS OF MASTER—REVIEW—CONFLICTING EVIDENCE.

Findings of fact by a special master on conflicting testimony, uninfluenced by mistaken conclusions of law, should not be disturbed, though the court, but for such findings, might have reached a different conclusion.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4008–4010; Dec. Dig. § 1019.*]

In Bankruptcy. In the matter of Michael Doyle, doing business under the name of Michael Doyle & Co., bankrupt. On specifications of objection to a bankrupt's discharge. Sustained in part.

James M. E. O'Grady, of Rochester, N. Y. (George P. Keating, of Buffalo, N. Y., of counsel), for bankrupt.

Harlan W. Rippey, of Rochester, N. Y., for trustee.

Lewis, McKay & McMillan, McGuire & Wood, and Harlan W. Rippey, all of Rochester, N. Y., for objecting creditors.

HAZEL, District Judge. Specifications in opposition to the discharge of Michael Doyle, the bankrupt herein, were filed by the trustee and various creditors, and, following the usual course, reference was had to a special master to ascertain the facts, and to report them with his opinion thereon to this court. The contest over the discharge of the bankrupt included eight specific objections in relation to each of which much testimony was taken; most of it, however, bearing upon the claim that the bankrupt transferred and concealed his property with intent to hinder, delay, and defraud the creditors of the bankrupt estate. At the beginning of the hearings before the special master, a number of preliminary objections were made on behalf of the bankrupt, but such objections in their entirety have not been seriously pressed. In any event, I think they are without substantial merit, and are therefore overruled.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Upon proceeding to the merits of the controversy, the evidence shows that the bankrupt and one Gebbie jointly engaged in the milk business a number of years ago at Rochester, N. Y., and that in 1895 the partnership was incorporated as the Mohawk Condensed Milk Company, and has at all times conducted a large and lucrative business. The bankrupt was bookkeeper as well as treasurer of the company, and originally owned 275 shares of its capital stock which number of shares together with additional shares he is claimed to have owned at the period of his bankruptcy. Along in about the year 1903 there was discovered a shortage in the accounts of the bankrupt as treasurer of the Milk Company, and in making good the indebtedness and liability he is claimed by the objecting creditors to have become insolvent, though he continued carrying on a separate business as an extensive dealer in fruits, dealing in domestic and foreign markets under the name of Michael Doyle & Co., and owned securities in various corporations and enterprises to the date of bankruptcy.

The evidence shows that in the year 1904 and in following years the bankrupt transferred to his wife insurance policies and securities, consisting of shares of stock in different corporations, amounting to a large sum of money. In 1906 he conveyed to her their homestead in Lake avenue, but the deed was not recorded until just before bankruptcy. He claims that several years prior thereto, while solvent, he assigned to her 270 shares of the capital stock of the Mohawk Condensed Milk Company, and also deposited large amounts of money in banks at different times in her name. In May, 1908, it was ascertained that Doyle had used in his individual business money that had come into his possession as treasurer of the Mohawk Condensed Milk Company, amounting in the aggregate to $192,621.95. It appears that from the time he first transferred securities to his wife he concededly signed her name on withdrawal checks and deposits made by him in her name, and in all his dealings with reference to credits and deposits and business transactions generally had her complete sanction. She herself gave no attention to her husband's affairs, and was willing that he should use as he saw fit the securities and money he had assigned or given her. She owned no property whatsoever save that which had been given her by her husband at different times during a period of 20 years anterior to the bankruptcy. The general claim of the objecting creditors is that the bankrupt has been insolvent since 1900, and that the various assignments of securities to his wife were made pursuant to a scheme by which she was to hold title thereto in order to withhold them from his creditors and from his trustee in the event of his adjudication as a bankrupt. In support of the contention that he was the personal owner of such assigned properties, it is pointed out that in his original schedule of assets and liabilities filed in this proceeding the 270 shares of stock of the Mohawk Condensed Milk Company are specified as an asset and subject to the lien of Belding Bros. for advances, and that subsequently he assigned such shares of stock to his wife

antedating the assignment ten years and eight months, to wit, December 24, 1897.

In May, 1908, at a meeting of his creditors held at the office of his attorney, the bankrupt practically admitted his insolvency, and at his request a committee of his creditors was appointed to examine into his affairs with a view to extending the time for payment of his debts if his business affairs and his ownership of properties, real and personal, so warranted. Afterwards the committee made a report to the creditors recommending a two years extension of time for payment, with the understanding that Doyle should transfer to the committee in trust all the real property and equities in personal property which he then claimed to own, and which concededly were of large value. He assented to the proposed arrangement on condition that the amounts realized on the sale of shares of stock, etc., over and above the amounts for which they were pledged might be used by him in the conduct of his business. However, on August 12, 1908, the committee of creditors further reported that, as a few of the creditors had put their claims in judgment, the existing negotiations for settlement had been abandoned, and that they had determined to file a petition in bankruptcy, which petition, by the way, had already been filed on the previous day by the attorney for the bankrupt who acted for the committee of creditors and the petitioning creditors. Importance is attached to the fact that the bankrupt and one of the petitioning creditors who was in his employ actively interested themselves in securing from different creditors proxies with an intention of electing a friendly trustee, and that at the creditors' meeting the challenge of the right to vote such proxies was sustained by the referee who then appointed the trustee herein. It is claimed that, when the bankrupt failed in his attempt to elect a trustee nominated by him, he filed for his wife in the bankruptcy court a claim amounting to $76,000.

The conclusions of the special master are principally based upon inferences drawn from the acts and conduct both before and after the bankruptcy of the bankrupt, whose denials of an intent to cheat and defraud his creditors the special master elected to disregard as unworthy of credence. It would not be worth while to review at length the various grounds of opposition to the discharge of the bankrupt, or to detail the evidence more fully, inasmuch as the master in an exhaustive opinion has stated his reasons for his conclusions and drawn specific attention to the proofs, were it not that, on motion to affirm his report, it was asserted that he had shown violent prejudice against the bankrupt.

In the determination of the specifications, it is of the utmost importance to first ascertain whether the bankrupt was insolvent within the meaning of the Bankruptcy Act when the asserted transfers and assignments of properties to his wife were made.

[1] In an action brought by the trustee against Mrs. Doyle to recover a preference—i. e., the conveyance on or about July 1, 1908, of the White street property—it was held by the trial court that at such

time and from March 1, 1908, the bankrupt was actually insolvent, and his insolvent condition known to the transferee. Was such his condition at a period earlier than that found by the trial court? The special master found that the bankrupt was insolvent in 1900, and continued in that condition throughout the years preceding the bankruptcy. His fruit business, before 1907, is claimed by him to have been fairly successful, although always uncertain from year to year as to profits, and he claims to have accumulated a substantial property from his investments from which he frequently not only assigned to his wife securities, stocks, etc., but also gave her money in various sums aggregating many thousands of dollars. Aside from his ownership of shares in the Mohawk Condensed Milk Company and the fruit business, he was the owner of a large number of shares of stock in a street railway enterprise in New England continuing therein from 1891 to the time of the bankruptcy. He was also a stockholder in the Manitou Beach Railroad to the amount of about $100,000, which interest, owing to the destruction of the railroad by a severe storm in the spring of 1908, terminated in the complete loss of the investment. While he was perhaps ignorant of his insolvency, as that term is defined by the Bankruptcy Act, and believed himself financially responsible a short time before the petition herein was filed, yet the excessive book values of his property, real and personal, the incumbrances thereon including outstanding accounts and items which, instead of being cleared off, were carried on his books from year to year as assets of his business, would seem to indicate his insolvency at an earlier period than found by the state court. On this subject it may briefly be stated that in the latter part of the year 1901 the liabilities of the bankrupt exceeded his assets by $47,820.09, and that such condition continued in increasing amounts in the following years, so that in the year 1908 there was a deficit of $73,381.70.

The conclusion, however, of the special master on this point is attacked as unfair to the bankrupt, as it is claimed that there was clear error in the major premise upon which it was based, in that the bankrupt did not carry upon his books as an asset an item of indebtedness to a Rotterdam firm of $84,673.77, and it is denied that his books were incorrect or false in this particular. The bankrupt contends that the claim of Vanderhoven Bros. was not in fact carried as an asset, that in 1904 the debt was compromised by the payment of $16,000 and his liability accordingly decreased, so that there was a saving to the business of $68,783, and not the claimed loss of $100,000. The witness Tylee, an expert accountant who for a period of four or five years prior to the bankruptcy was a bookkeeper for the bankrupt, substantially testified that the books carried the account of Vanderhoven Bros. as an asset and failed to show a settlement prior to 1904. It appears, true enough, that the ledger carried the account as a liability, yet there was no corresponding credit to the merchandise account prior to October 21, 1904. While it is not thought that the evidence establishes intentional falsification of the books, yet that they show large losses in the business from year to year and the insolvency of the bankrupt for a period of four or five years prior to the bank-

ruptcy is sufficiently demonstrated, and in reaching this conclusion I have not omitted to consider the claim of the bankrupt that various properties, including Brighton real estate, were not sufficiently taken into account by the special master.

[2] As to the specifications: The special master found as established specification 2 which relates to a false oath made by the bankrupt, in that he testified that he did not in the year 1908 transfer any property to his wife. I think, however, that in view of the bankrupt's explanation before the completion of his examination that he had testified inadvertently and mistakenly regarding such transfers of securities, and that it was not his intention to falsely testify, negatives any intention on his part to make a false oath in this proceeding.

[3] Nor do I regard the third specification, relating to the concealment of wax paper, cartons, etc., should bar his discharge. It appears that, after his adjudication, the bankrupt continued his business as agent for his wife, and that the receiver sold him some of the stock on hand, and that correspondence was afterwards exchanged between the bankrupt and the receiver relating to the purchase by the bankrupt of additional property that had been left in his possession. The evidence falls short of showing that there was a fraudulent concealment of the property within the meaning of the Bankruptcy Act. In fact, there seems to have been a tacit acquiescence by the receiver, who was entitled to take the property into his possession, that the bankrupt should use such materials with the understanding that Mrs. Doyle would pay therefor.

[4] The fourth specification relates to the transfer by the bankrupt to his attorney of his equity in certain securities which were not scheduled and of money on deposit in the National Bank of Commerce. The assigned securities had been pledged as collateral security for previous loans and advances to the bankrupt, and, though the bank has since satisfied its claim out of part of the collateral pledged to it, the assignee, Mr. O'Grady, has not realized anything on the remaining securities or on the amount realized on the sale by the bank, nor taken the same into his possession under his assignment. Since the argument he has tendered to the trustee the delivery of an assignment of his interest in the securities, but, according to the reply brief, such assignment was conditional and in the opinion of counsel for the trustee necessitates bringing an action against the bankrupt to recover the equities. Such conditional assignment will not now relieve the bankrupt from the consequences of his acts, or be considered to negative his obvious intention to conceal his equities in such property, which, according to the evidence, amounted to about $900. The assignment to his attorney was made on the day before the filing of the petition in bankruptcy, and was delivered to the bank holding the securities in pledge after the adjudication. The explanation of the bankrupt that the assignment was made merely for the purpose of enabling his attorney to collect the surplus after satisfying the pledge seems especially incredible in view of the fact that he was thoroughly familiar with the bankruptcy proceedings which were then imminent, and his omission to schedule his interest in the said securities indicates an

intentional concealment of his property and an utter disregard of his duty to surrender it to his creditors.

[5] By the seventh specification, the bankrupt is charged with having deeded to his wife an undivided one-half interest in the warehouse on White street. It is shown that in an action in the Supreme Court of this state by the trustee against Mrs. Doyle it was decided that the conveyance to her was to secure her as creditor to the amount of $10,000, but, as the conveyance was made within four months of bankruptcy, a preference had been given his wife by the bankrupt over other creditors of the same class, and by decree of the court such deed was canceled and annulled. The learned court expressed the opinion that the said transfer was not fraudulently made, but that it was made in the belief that the bankrupt was still solvent. The special master, however, believed that the evidence before him disclosed a fraudulent concealment by the bankrupt of his property under section 14b of the Bankruptcy Act. Inasmuch as the Supreme Court expressly found that $10,000 was borrowed by the bankrupt from Mrs. Doyle a number of years before the conveyance, it may fairly be accepted I think that the transfer was in the nature of a preferential payment to Mrs. Doyle, a creditor, as distinguished from a fraudulent transfer to which latter the element of an intent to defraud is essential. Githens et al. v. Shiffler et al. (D. C.) 112 Fed. 505; In re Maher (D. C.) 144 Fed. 503.

[6] The fifth specification charges a transfer by the bankrupt while insolvent of 270 shares of the capital stock of the Mohawk Condensed Milk Company of the par value of $27,000. The bankrupt testified that he transferred these shares of stock to his wife on December 24, 1897, the consideration therefor being his love and affection for her, and that later, on January 6, 1908, he assigned to her five additional shares which were not included in the earlier exhibit assignment. He claims to have been clearly solvent at these times, and, indeed, there is no evidence to show that that was not the situation at the date of the earlier assignment.

The ramifications of this stock which is now held by the Genesee Valley Trust Company as a pledge for advances to the bankrupt, and which is valued at $60,000 over the amount pledged, need not be dwelt upon. Its fraudulent concealment concededly depends wholly upon whether or not it was actually assigned by the bankrupt to his wife in the year 1897. It was scheduled by the bankrupt as an asset, and at the time of the bankruptcy was held by Belding Bros. of New York City as collateral security, being afterwards pledged to the Genesee Valley Trust Company. It appears that because of his ownership thereof Doyle in 1908 became entitled to receive 812 shares of increased stock in the Mohawk Condensed Milk Company of the value of $81,200. All of the stock was issued to the bankrupt save one-half of the said increased stock, which was issued to Mrs. Doyle at the suggestion of the Bank of Commerce for the purpose of securing a loan of $40,000 made to her after a refusal of the same to the bankrupt. The bankrupt testified that he had assigned the original shares to his wife.

and the purported assignment was offered in evidence. No claim is made that Mrs. Doyle took title to the stock, or that it was transferred to her on the books of the company. Her testimony as to her ownership was indefinite and contradictory. Her version of the transaction is that in 1905 a friend advised her to have this stock put in her name, and that, shortly afterwards, she received 270 shares, and within a year or two 5 additional shares, while the purported assignment was dated ten years before the transfer of the latter shares. She also testified that the assignment was made to secure advances to her from the Genesee Valley Trust Company and Belding Bros. for and on account of her husband, but the evidence clearly shows that she borrowed for Mr. Doyle after the bankruptcy proceedings were instituted, and not before. Subsequent to the bankruptcy the bankrupt prevailed upon Mr. Badger to give his note to the Genesee Valley Trust Company for $88,855.-92, the amount for which the stock was pledged to Belding Bros., and which was then held by the Trust Company as collateral to the Badger note, together with other shares owned by Curtice Bros. At such time there was delivered to the Trust Company an agreement between Mrs. Doyle and Mr. Badger reciting that Mrs. Doyle was the owner of 275 shares of stock in the Mohawk Condensed Milk Company, and that, on payment of the Badger note, such number of shares would be transferred to her.

The theory of the objecting creditors is that at the time the bankrupt scheduled such shares of stock subject to the claim of Belding Bros. he believed the trustee would accept his view that there was no equity therein, but that, failing in the election of a friendly trustee, he attempted to conceal his equities by the purported assignments in evidence, and the recitation of ownership in Mrs. Doyle, contained in Exhibit 47. The special master fully considered the circumstances in their entirety. Rejecting the testimony of the bankrupt and his wife in relation to the assignment of the shares of stock, he credited the testimony of the witness Hamilton, a handwriting expert, who testified that in his opinion the purported assignment was executed in the fall of 1908, and not in December, 1897, as claimed by the bankrupt. The opinion was based upon a comparison of the signature of the assignment with the admitted handwriting of the bankrupt in 1897 and 1908 and upon a chemical test of the ink used, but such expert testimony was contradicted by another handwriting expert, the witness Osborn, who asserted that in his opinion it was impossible to state the month or year of the execution of the assignment, though he admitted that the handwriting of the bankrupt had changed from 1897 to 1908. Testimony of handwriting experts, the use of the microscope to make a test of disputed handwriting or of the particular ingredients of the ink used, is at times of undoubted assistance in determining whether or not the writing under consideration was done at a purported time; but, in view of the contradictory testimony of the expert witnesses, I do not ascribe very much value to the testimony of the witness Hamilton, and would not

on that testimony alone discredit the assignment, but the many peculiar circumstances in the case support that view and persuasively indicate that such stock at the filing of the petition herein was really the property of Doyle subject only to the pledge of Belding Bros.

[7] No one would perhaps wish to convict the bankrupt of committing an offense punishable by imprisonment under section 29 of the Bankruptcy Act on such a showing, but, to bar a bankrupt's discharge, it is enough, I think, that the evidence by a fair preponderance establishes a fraudulent concealment, and proof thereof beyond a reasonable doubt is unnecessary. In re Leslie (D. C.) 119 Fed. 406; In re Delmour (D. C.) 161 Fed. 589; In re Dauchy (D. C.) 122 Fed. 688; Collier on Bankruptcy (9th Ed.) 339. In disregarding the testimony of the bankrupt and his wife, the special master acted clearly within his rights; the conclusion reached by him being that the evidence was so conflicting that it could not be safely considered to negative the presumption of fraud following from the conduct of the bankrupt. The fact that at the outstart-the bankrupt scheduled such shares as an asset would seem to strongly negative the bona fides of the assignment. His absolute control over the stock from the time it was issued down to the bankruptcy to the positive exclusion of his wife, his various pledges thereof to banks and Belding Bros. without informing the pledgees until after the bankruptcy of his assignment to his wife, his assumed ownership, the failure of himself and wife to assert to Gebbie during the complications with the Milk Company the wife's ownership of the stock, the failure to transfer the same on the books of the company, are all circumstances which to my mind indicate the absence of an intention to legally transfer the stock to Mrs. Doyle. The purported assignments standing alone, without the delivery of the property therein described or without some affirmative act indicating Mrs. Doyle's ownership thereof, do not persuade me of the legality of the assignments, or that the bankrupt actually divested himself of title thereto. As said by Judge Ray in Re Leslie, supra, in passing upon the question of the weight of the testimony:

"Courts are not compelled to accept the bald statements of interested witnesses, or of any witness when his statements are laden with inconsistencies, or burdened with inherent improbabilities, or discredited by incriminating confessions."

From all the circumstances preceding and following the bankruptcy, it is difficult to escape the conclusion that the bankrupt designed to save as much as possible out of the financial wreck, and, having reason to believe that the stock was of much more value than the amount for which it was pledged, attempted to conceal the same.

[8] To permit its disposal by fraudulent methods would obviously prevent a just administration of his estate, and I am therefore constrained to hold that the findings of fact by the special master upon conflicting testimony, uninfluenced by any mistaken conclusions of law, should not be disturbed, even though this court

but for such findings might have reached a different conclusion. Such is the rule enunciated in Re Harr (D. C.) 16 Am. Bankr. Rep. 213, 143 Fed. 421, and in numerous other cases.

Another specification, the ninth, dealing with an intent on the part of the bankrupt to conceal his true financial condition, as shown by his failure to keep books of account from which his financial condition could be ascertained, has been sustained by the special master, but I think it would serve no useful purpose to explicitly pass upon such specification. Enough has been stated to show that the bankrupt intentionally concealed certain portions of his property to hinder, delay, and defraud his creditors; such concealment not being avoided by the mere scheduling of the 275 shares of stock as an asset, for the word "conceal" by subdivision 22 of section 1 of the Bankruptcy Act is given a broad meaning, and the subsequent acts of the bankrupt, and the evidence generally, showing that he has attempted to keep such property or the equities therein from the possession of his trustee is controlling of the question of whether or not there was a concealment thereof to hinder, delay, and defraud creditors.

My conclusion is that specifications 2, 3, and 7 are overruled, while specifications 4 and 5 are sustained. It follows that the discharge of the bankrupt will be denied.