### In re DE MAURIAC.

(District Court, E. D. New York.   July 31, 1913.)

BANKRUPTCY (§ 407*)—DISCHARGE—OBJECTIONS—CONCEALMENT OF ASSETS.

> Where a bankrupt received $2,000 from his brokers shortly before bankruptcy, which amount was not scheduled, but used for his own purposes and in the name of his wife, such concealment constituted ground for the denial of a discharge, without reference to whether the money was his, or was the proceeds of a loan to him.

> [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 729–731, 737, 738, 740–751, 758, 760, 761; Dec. Dig. § 407.*]

In the matter of bankruptcy proceedings of Norman P. De Mauriac. Application for discharge denied.

Henry B. Singer and James J. Franc, both of New York City, for objecting creditors.

Crocker & Wickes, of New York City (Frank L. Crocker, of New York City, of counsel), for bankrupt.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CHATFIELD, District Judge. The bankrupt has applied for a discharge, and after a hearing before a special commissioner a report was filed recommending that the discharge be denied.

The bankrupt brought to the attention of the court certain statements in the commissioner's report, from which he inferred that the commissioner had prematurely received a mistaken impression of the facts, and by reason of the situation involved the court has read the testimony, and, having heard argument de novo, has disregarded the findings of the special commissioner, and has made its own determination with respect to the matter.

The record shows that some seven grounds of objection to discharge were stated. Of these but two need be considered. The first one, that the bankrupt, in anticipation of insolvency, and with intent to hinder, delay, and defraud his creditors, concealed certain property, to wit, $2,-000, is the one principally urged. The second objection is that, in verifying his schedules in bankruptcy, the bankrupt neglected and intentionally omitted to state the securities with which he was credited in certain speculative accounts at his brokers', and to offset against these the amounts borrowed and debited by the brokers in the same transactions.

The creditors have examined the witnesses and prosecuted the case with the greatest diligence, and much testimony has been taken. It appears that one of the objecting creditors, who were stockbrokers, had brought suit against the bankrupt, and trial was had in December, 1911. Upon the 15th day of that month a verdict was rendered for the plaintiffs, upon which judgment was entered upon the 12th day of January, 1912. Bankruptcy was instituted upon March 29, 1912.

Upon the same day on which the verdict was rendered against the bankrupt, he obtained from his brokers $2,000 in the form of cash, which was kept in the company's strong-box a few days, later deposited in the name of the company's cashier, and upon the 1st day of February, 1912, returned into an account in the name of the bankrupt's wife, with which he continued to speculate.

Dispute has arisen as to whether the broker suggested this course of procedure, or whether the bankrupt asked the broker to do it in this way. It appears to be the fact that the broker did suggest that the money could be left in this particular form of account, and that the broker did not figure up the bankrupt's balance, but in a sense loaned or advanced upon his own credit, as one of the firm, this sum of $2,-000 to the bankrupt.

It is apparent, also, that the bankrupt and the broker had in mind at the time the necessities of the bankrupt in the way of living expenses, and that they both knew of the probability of a judgment going against De Mauriac. It is also apparent that this was an endeavor to place $2,000 out of the reach of De Mauriac's creditors, and, even if the money was loaned by the broker, title was vested in the bankrupt, and his creditors had the right to obtain the money upon execution.

As a matter of fact the money was not used for household necessities, but these were met from any and every source, including the play-

ing of whist at a club, and the bankrupt ultimately used the $2,000 to pay his gambling debts and to pay for other speculations.

At the time the bankruptcy petition was filed, certain accounts, such as the Alice De Mauriac "short account", were in existence, of which the trustee did not learn for a long time, and which showed a credit balance. Although this account was in Mrs. De Mauriac's name, it was actually the bankrupt's property, and he used it as his own, and should have included it in his assets.

The testimony finally shows, however, that at the time the petition was filed and the schedules made out the balance of all the accounts with the broker was either a debit balance, or very small on the credit side, and by the advice of De Mauriac's attorney (it being De Mauriac's opinion that the balance would be upon the wrong side, but that the broker would not hold him for this slight debt) nothing was put in the schedules with respect thereto.

As to this last objection, it is apparent that if De Mauriac had been entirely frank, and had not indicated that he considered the brokers' accounts as outside of his creditors' reach, there would be insufficient ground for denying discharge. Taken with the first allegation, as to the concealment of the $2,000, it is apparent that the attorney's advice was based upon De Mauriac's statement as to these accounts, and that De Mauriac's actions with respect thereto did not show any attempt to put his creditors in possession of the information which they were entitled to have.

As to the first allegation, viz., the concealment of the $2,000, but one construction can be given to what De Mauriac did. Whether the money was his, or was borrowed, his estate was enriched by that amount, which was available at that time to his creditors, and he concealed the sum prior to bankruptcy, used it for his own purposes, and in the name of his wife, who appears to have supposed that it was really hers, and that her husband's actions were within his rights.

Such disregard for his creditors' rights and for the law makes out a plain case of concealment of assets, with the idea of delaying, hindering, and defrauding creditors in realizing upon their debts. As this occurred within four months before bankruptcy, it is sufficient to prevent discharge, and the additional indifference shown by De Mauriac in giving the information to his attorney, at the time of making up the schedules, strengthens the conclusion of the court that the discharge should be denied.