## In re STAFFORD.

### (District Court, D. Connecticut. September 1, 1915.)

### No. 3239.

1. EQUITY ⚖️409—FINDINGS OF SPECIAL MASTER—WEIGHT.

Findings and report of a special master are entitled to the greatest weight, and should be set aside by the court only in case of manifest error.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 904, 920–923; Dec. Dig. ⚖️409.]

2. BANKRUPTCY ⚖️408—DISCHARGE—CONCEALMENT OF ASSETS—FALSE OATH.

Bankrupt will not be denied a discharge on the ground of concealment of assets or false oath to his schedules, where there was no fraudulent intent, but he disclosed the full facts to competent counsel to advise him, and was guided by their advice as to what the law required him to include in his schedules.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 732–736, 759, 762, 763; Dec. Dig. ⚖️408.]

3. BANKRUPTCY ⚖️407—DISCHARGE—"FALSE" CREDIT STATEMENTS.

"False," within Bankr. Act July 1, 1898, c. 541, § 14b (3), 30 Stat. 550 (Comp. St. 1913, § 9598), barring right to discharge of a bankrupt who obtained credit on false statements made by him for that purpose, meaning false, coupled with an intent to deceive, statements signed by bankrupt as president of a corporation, containing a true report of its financial condition as shown by its books, and in signing which he wholly relied on the advice and judgment of his financial adviser, who had looked over and approved them before they were submitted to him for his signature, will not have such effect.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 729–731, 737, 738, 740–751, 758, 760, 761; Dec. Dig. ⚖️407.

For other definitions, see Words and Phrases, First and Second Series, False.]

In Bankruptcy. In the matter of George A. Stafford, bankrupt. On motion to confirm report of special master. Confirmed, and bankrupt discharged.

Charles D. Lockwood, of Stamford, Conn., for bankrupt.
Galen A. Carter, of Stamford, Conn., for objecting creditors.

THOMAS, District Judge. This matter is now before the court on a motion to confirm the report of the special master, on a reference to hear the evidence and make a finding and report on specifications filed by certain creditors in opposition to the bankrupt's dis-

charge. The master found that the grounds of objection were not sustained, and recommended that the bankrupt be granted his discharge.

The evidence shows that the bankrupt, as president of G. A. Stafford & Co., a corporation, signed and sent to each of the objecting creditors on January 22, 1913, a written statement which purported to show the financial condition of the corporation on December 31, 1912, all the statements being identical in form and substance; the original having been submitted to and approved of by one Jerome, the financial adviser of the corporation, whose advice it was accustomed to follow in all financial matters, and to whom it paid a salary for acting as its financial adviser, and at the same time Jerome was and had been a stockholder and director of the Chatham & Phœnix National Bank, one of the objecting creditors, and was and had been on its discount committee, and it was he who arranged in the first instance with that bank, and with the other objecting creditors, for the lines of credit which they extended the corporation in the discounting of its paper, all of which bore bankrupt's indorsement.

The statements were gotten up by the corporation's bookkeeping department, under Jerome's supervision, and bankrupt supposed and believed them to contain a true statement of the corporation's condition as shown by its books. They were not correct, however, in that although, on December 31, 1912, the corporation owed $159,517.70 on account of loans made to it by two banking firms in December, 1912, no part thereof was included in the total of the liabilities, set forth in the statements, nor did any of said statements include, either under the head of "Accounts Receivable" or otherwise, accounts which the corporation had assigned to the concerns making these cash advancements, as security for payment of their loans, with this exception, that the excess of the face value of the accounts thus assigned, amounting to about $14,000, over and above the indebtedness owed on these loans, went to make up the total of the item therein termed "Accounts Receivable," although the statements did not specifically so state.

Bankrupt knew of these facts, but he believed that, where accounts were so assigned, they became the property of the person to whom assigned, and that no part thereof belonged to the corporation, other than whatever the excess might be, in face value, over and above the indebtedness to secure which they had been assigned.

The result was that the statements, correct in other respects, in so far as is here material, accounted for only the assumed equity in the assigned accounts, instead of putting the entire amount thereof on one side of the statements and the indebtedness to secure which they were assigned on the other, so that they contained nothing from which any knowledge could be obtained, by persons not otherwise acquainted with the facts, that the corporation had pledged some part of its "accounts receivable" as security for loans.

Without knowledge of the fact that the corporation owed the sum of $159,517.70, in addition to the amount of its liabilities set forth in said statements, or that accounts owing the corporation of about the same amount had been assigned as security for cash loans, the Coal & Iron National Bank on January 2, 1913, discounted for the corpora-

tion one of its notes for $5,000, bearing bankrupt's indorsement; on January 10th, another similarly indorsed and of like amount; a third on January 22, 1913; and still another on March 6, 1913.

The Metropolitan Bank on December 24, 1912, also without knowledge of the facts above related, discounted one of the corporation's notes for $5,000 bearing bankrupt's indorsement; a similarly made and indorsed note for the same amount on February 13, 1913; and on March 6, 1913, one for $2,500. And the Chatham & Phœnix National Bank, without knowledge of said facts, discounted two $5,000 notes of the corporation bearing bankrupt's indorsements, on January 16, 1913; two more of like amount and similarly indorsed, on January 29th; and two others on February 5, 1913. All of these $5,000 notes were full renewals, and the $2,500 note a partial renewal, of notes maturing on or about the dates mentioned; the originals representing cash loans made to the corporation prior to December 31, 1912. The note of $2,500 maturing on March 6, 1913, was met by the note then discounted and a cash payment by the corporation of $2,500.

Both the Coal & Iron National Bank and the Chatham & Phœnix National Bank had been doing business with the corporation from about the time it commenced business in February, 1908, and previous to that time had had business transactions with another concern in which the bankrupt was largely interested, so that the managers of these banks were well acquainted with bankrupt, and knew his business standing and reputation covering a period of at least eight years, and during that time the Chatham & Phœnix National Bank and the Chatham Bank, which was its immediate predecessor, had discounted and been fully paid commercial paper on which the bankrupt was indorser amounting to over $500,000.

The first paper, however, which the Metropolitan Bank discounted for the corporation, was brought to that bank some time in February, 1912, shortly after the corporation, acting on the suggestion of Jerome, its financial adviser, who was solicited thereto by one of the bank's officers, had opened a deposit account therein; and he at the time presented to the bank a statement which purported to show the financial condition of the corporation as of December 31, 1911, similar in every way to one furnished by it to the other objecting creditors on January 20, 1912.

The loans which the objecting banks made the corporation, represented by the original notes, were based, not only upon the financial standing of the corporation on December 31, 1911, as shown by the statements sent to the first two mentioned banks under date of January 20, 1912, and to the third on February 27, 1912, but partly upon the reputation of the bankrupt in the cotton goods trade and among bankers generally. The funds thus obtained were used exclusively in the furtherance of the corporation's business, and bankrupt had no direct benefit from any loans made the corporation.

Had any of the objecting creditors knowledge of the fact that the corporation was pledging any of its accounts receivable as security for loans obtained from other parties, they would not have advanced any money on notes of the corporation bearing bankrupt's indorsement

226 F.—9

alone, unless the same was accompanied by satisfactory collateral; neither would they have accepted the notes which they received during the months of January, February, and March, 1913, in renewal of the notes of the corporation then maturing.

Several corporations and mills closely allied with this corporation, or owing it large sums of money, together with financial institutions to whom it was indebted, became involved in financial difficulties; some going into the hands of receivers, others into bankruptcy, and still others into the hands of creditors' committees. The corporation was thus deprived of a large amount of standing discount credit which it had been accustomed to depend upon whenever required from certain banks and bankers, and the losses on its February, 1913, business, as shown by the report of the corporation's bookkeeper to the bankrupt late on the night of March 13, 1913, was such that bankrupt determined it was best to seek legal advice, with a view of having receivers appointed for the corporation, so as to stay the claims of holders of maturing obligations, and conserve the interest of all its creditors by preventing its assets from being unduly sacrificed.

On the next day bankrupt consulted a member of the New York bar, who then resided near his home, explained to him the corporation's situation and his connection with its affairs, and under the attorney's advice equity proceedings were begun and had and receivers appointed for G. A. Stafford & Co. on March 18, 1913.. At this time neither the bankrupt, nor the attorney whom he consulted, nor the receivers of G. A. Stafford & Co. for some time after their appointment, although they had made an investigation of the corporation's affairs, believed the corporation anything but solvent, or that anything further was necessary than that a reasonable time be granted the corporation in which to realize the fair value of its assets in order to pay its creditors in full.

During the conversation which bankrupt had on March 14th with this New York attorney, he was questioned as to the record title to his home, and, having informed the lawyer that it stood in his own name, although he had for some time contemplated conveying the equity therein to his wife, the lawyer advised that he should do this without delay, and that there was no legal impediment to such a transfer being made. The lawyer prepared deeds of conveyance, and the bankrupt executed the same, and thereby the title to bankrupt's home became vested in his wife on March 17, 1913.

Bankrupt, having received no salary from the corporation after November 1, 1912, and realizing that the company would be unable to pay him any for some time to come, arranged with one Boyle, his brother-in-law, to advance him from time to time, as he might require for family living purposes, $17,500, for which bankrupt was to give his note, secured by a second mortgage on said premises for $17,500, naming as the payee in the note and as the grantee in the mortgage deed one Franklin B. Gardner, whom it had been agreed would act as trustee for Boyle, and Boyle thereafter, through said Gardner, advanced the sum of $4,000 on the strength of said note and mortgage, and at all times was able and ready and intended to pay bankrupt the remainder of the sum agreed upon whenever requested. This

note and mortgage was subsequently assigned by Gardner to Boyle, and at the time of the hearing of this matter Boyle was the record owner of the mortgage.

While bankrupt's attorneys were preparing the schedules of his bankruptcy petition, he related to them the facts concerning the transfer to his wife of his equity in the homestead, and was told that, because the savings bank holding the first mortgage on the property had subsequently required the wife, as owner of the equity, to sign the mortgage note, which bankrupt had originally executed in favor of the bank, and as the holders of mortgage notes would have to surrender their security before they could file their claims against his estate, and as the security was ample, and there was no probability of such claims being presented in his case, it was not necessary for bankrupt to list the mortgage notes as liabilities in the schedules, and as more than four months had passed since the equity in the real estate had been transferred to his wife he was not required to include it as an asset in his schedules.

Early in May, 1913, the auditor's report on Stafford & Co. having shown such a shrinkage in the value of its assets as to indicate its inability to pay all creditors in full, bankrupt, realizing his obligations as indorser on the corporation's paper, with the knowledge and consent of his wife, informed the receivers, and by writing the president of the Chatham & Phœnix National Bank, that he was ready and willing to turn over to the receivers, as trustees for the benefit of his creditors, all his real and personal property, and intended to include therewith the equity in the homestead then standing in the name of his wife.

Bankrupt and his wife were ever ready and willing to release the equity in the homestead to his trustee, and expected that the trustee would make request therefor, and bankrupt's attorneys had knowledge of this fact, and had had several conferences with the attorneys representing the trustee as to such a transfer being made. The trustee in bankruptcy, nevertheless, without making request of the bankrupt or his wife for the conveyance of said equity to him, brought suit therefor, returnable to the superior court for Fairfield county, Conn. This suit was subsequently withdrawn, upon the bankrupt and his wife executing a conveyance of their interest in the homestead to the trustee.

The bankrupt filed his petition in bankruptcy on October 6, 1913, and the objecting creditors later filed their proofs of claim, based on the bankrupt's indorsement of the corporation's aforementioned notes. These creditors now claim that the statements sent them on January 22, 1913, should have given the information of the additional indebtedness for the cash loans to the corporation during December, 1912, to secure the payment of which accounts owing the corporation had been assigned, and because these statements contained nothing whereby creditors could obtain knowledge of those facts, that the statements were not true and complete as to the corporation's financial condition on December 31, 1912, and therefore were materially false, and because bankrupt signed them, with knowledge of said omissions, that he had obtained from the objecting banks money on credit upon ma-

terially false statements in writing made for the purpose of obtaining such credit, and that the applicant for discharge, while a bankrupt and after the appointment and qualification of his trustee, knowingly and fraudulently concealed certain property, i. e., real estate, from his trustee, inasmuch that, while he had caused to be executed and placed on record a mortgage of $17,500, no consideration therefor was advanced by the party named as the mortgagee therein, and that he had subsequently transferred through a third party to his wife, without consideration, said premises, subject to said mortgage and to a prior savings bank mortgage; that he continued to conceal said property until after the trustee had brought the suit against bankrupt and his wife, claiming a conveyance of said premises to him as trustee; that bankrupt had executed said mortgage of $17,500, and subsequently transferred the equity in the premises to his wife, for the purpose of hindering, defrauding, and delaying the objecting creditors while he was heavily indebted to them; that he knowingly and fraudulently omitted said property from his schedules of assets, and also knowingly and fraudulently omitted from his said schedule of liabilities the mortgage note of $20,000 to the savings bank, and, having sworn to the truth of his bankruptcy schedules, he had thereby knowingly and fraudulently made a false oath to his petition and schedules in bankruptcy; and that therefore his petition for a discharge should be denied.

The principal questions are, in view of the facts found by the special master, which seem to me to be supported by the evidence:

First. Should the bankrupt be denied his discharge because, while president and principal stockholder of a corporation, now in course of liquidation through equity and receivership proceedings, brought and pending in New York state, he permitted to be issued and sent out over his signature as such president certain statements in writing purporting to set forth the true financial condition of the corporation, which statements in a measure were relied upon by some of the objecting creditors as a basis for the acceptance of renewals of certain notes of the corporation held by them and representing loans which they had previously made to the corporation.

Second. Should the bankrupt be denied a discharge because of the fact that some six months before his adjudication as a bankrupt, and while he believed that he was solvent, he conveyed to his wife, without consideration, his equity in the homestead, and because he had also failed to list in his bankruptcy schedules said equity as an asset, and also, as a liability, certain of his own notes secured by mortgage on said real estate.

[1] The rule that the findings and report of a special master are entitled to the greatest weight, and should be set aside by the court only in cases of manifest error, is too firmly established to require the citation of authorities. In the Matter of Hodge (D. C.) 205 Fed. 824, it was held that the conclusion of a referee, who saw and heard the witnesses, should only be disturbed in clear cases of error, and—

"the referee's findings upon conflicting evidence or when different inferences may be drawn from a conceded state of facts, are entitled to the same consideration as those of a District Judge."

[2] The failure to schedule or surrender property to the trustee is not per se, or ipso facto, knowingly and fraudulently concealing it, though an omission to schedule property fraudulently conveyed usually amounts to a concealment where the bankrupt retains any interest therein. Where, however, the evidence shows an entire absence of fraudulent intent, no such offense has been committed as will warrant the denial of a discharge on the ground of concealment. In re McCann (D. C.) 179 Fed. 575; In re Doyle (D. C.) 199 Fed. 247; In re De Mauriac (D. C.) 206 Fed. 358.

Where it appears that a bankrupt has concealed assets which have not been listed in his schedules, he will be deemed to have taken a false oath when he swore to the truth of the schedules. In re Hale (D. C.) 206 Fed. 856; In re Cantor, 26 Am. Bankr. Rep. 859. But if a false oath was due to a mistake in fact, or the honest advice of counsel, to whom the bankrupt had disclosed all the facts relative to the items omitted from his schedules, and which form the basis of the objections, a discharge will not be refused. In re Doyle (D. C.) 199 Fed. 247; In re Eaton (D. C.) 110 Fed. 731. In other words, such oath must have been knowingly and fraudulently made. In re Cohen et al. (D. C.) 149 Fed. 908; In re Salsbury (D. C.) 113 Fed. 833.

Such an objection will be sustained by such proof as will overcome the presumption as to the honesty of the bankrupt's purpose. Remmers v. Merchants'-Laclede Nat. Bank, 173 Fed. 484, 97 C. C. A. 490. The bankrupt, having disclosed the full facts to counsel competent to advise him in the premises, and having been guided by their advice as to what the law required him to include in his bankruptcy schedules, should not be made to suffer, even if such advice was erroneous.

[3] Relative to the objections based upon the alleged falsity of the statements sent out January 22, 1913, said alleged falseness consisting in the omission of the debit and credit items hereinbefore mentioned, it will be noted that this phase of the controversy must be confined within very narrow limits.

These creditors now claim that the financial statements sent out January 22, 1913, should have given information of the indebtedness of $104,577 to Dockendorf & Co. and the $55,000 owed Gay & Co. on account of their advancements to the corporation in December, 1912, and that they should have included the assigned accounts, or given information as to their having been so assigned, and that, because there was nothing in them whereby creditors might obtain knowledge of those facts, the statements were not true and complete statements of the corporation's financial condition on December 31, 1912, and therefore were materially false.

The statements complained of were signed by the bankrupt as president of the corporation, and the testimony is undisputed that the notes received by the banks from the corporation during the month of January, 1913, were accepted by them upon the standing of the corporation as understood from the statements dated January 20, 1912 (to which no exceptions have been taken), and the investigation which the bank officers had then made relative to the condition of

the corporation's business and the bankrupt's personal standing. The only notes, therefore, which can now be claimed to have been accepted on the basis of the financial statements which form the basis for this objection were those received by the banks on February 3, February 13, and March 6, 1913.

The law requires that the written statement relied upon to bar a discharge must not merely be shown to be incorrect but intentionally and knowingly so. The word "false," as used in section 14b (3), means false coupled with an intention to deceive. Gilpin v. Merchants' Nat. Bank, 165 Fed. 607, 91 C. C. A. 445, 20 L. R. A. (N. S.) 1023; Franklin v. Monning Dry Goods Co., 217 Fed. 929, 133 C. C. A. 601. It must also be shown that the creditor relied upon the statement when parting with his money or property, and that, if he did rely upon it, and it was materially false in fact, it is sufficient to defeat a discharge. If the creditor, however, did not rely upon it, or if the debtor did not make the statement for obtaining the money or property on credit, it will not bar a discharge, no matter how false the statement may have been. Shaffer v. Koblegard Co., 183 Fed. 71, 105 C. C. A. 363. A false statement made by a bankrupt may bar his right to a discharge, although the credit was obtained by a corporation of which the bankrupt owned the majority of the stock. In re Dresser & Co. (D. C.) 144 Fed. 318; In re Bleyer, 215 Fed. 896, 132 C. C. A. 236.

Waiving the question as to whether any part of these notes actually represent money obtained by the corporation, the court is now called upon to say whether the decision of the Circuit Court of Appeals for the Second Circuit, in the Matter of Bleyer, supra, must be so construed as to prevent the benefit of a discharge to the bankrupt herein. A careful reading of that case will disclose that Bleyer conducted his business under the form of a corporation, and, as the president thereof, procured money from a bank on notes of the corporation indorsed by him, a large portion of which money he devoted to his individual use, while in this case the evidence is that the money which the corporation obtained on the loans represented by the original notes all went to the legitimate uses of the corporation, and that the bankrupt received no personal pecuniary benefit from any moneys loaned the corporation.

It will therefore be seen that the decision of the court in that case was based upon the fact that the bankrupt had, by his own willful misrepresentation and deceit, obtained a personal advantage, while in the case at bar the facts are that the bankrupt believed that the statements which he signed contained a true report of the financial condition of the corporation as shown by its books, and that he wholly relied upon the advice and judgment of his financial adviser, Jerome, who looked over and approved the original of the statements before they were submitted to bankrupt for his signature. I am therefore of the opinion that the special master was justified in concluding that the objectors had failed to sustain their contentions.

The report of the special master will therefore be confirmed, and a discharge granted. Decree accordingly.