term not to exist. See Mr. Circuit Justice Miller's opinion, [Parmley v. St. Louis, I. M. & S. R. Co., Case No. 10,768.]

---

BAILEY v. ATLANTIC & P. R. CO. See Cases Nos. 10,767 and 10,768.

BAILEY v. ATLANTIC & P. R. CO. See Case No. 10,845.

BAILEY, (CHEMICAL NAT. BANK v.) See Case No. 2,635.

BAILEY, (CLARK v.) See Case No. 2,814.

BAILEY, (COLLENDER v.) See Case No. 2,998.

---

## Case No. 733.

### BAILEY v. COMINGS.

[16 N. B. R. 382; 4 Law & Eq. Rep. 684; 10 Chi. Leg. News, 49; 25 Pittsb. Leg. J. 51.]

Circuit Court, E. D. Missouri. Oct. 25, 1877.

BANKRUPTCY—HOMESTEAD EXEMPTION—"HEAD OF A FAMILY."

[1. In 1873, the owner and occupant of a farm left it on account of his health, and went to reside with his brother in M., about 12 miles away, leaving his farm in charge of a family which he had engaged to come and live in the house with him, and work the farm on a division of the crops, etc. In M., he did enough work about his brother's mill to equal the value of his board. In 1876, he returned to the farm. While at M., he once voted, and there was some evidence that he spoke of M. as his home, and that during his stay there he was nominated as a candidate for justice of the peace, but he never authorized his name to be so used. *Held,* that his right to a homestead exemption under 1 Wag. St. Mo. pp. 603, 604, 697, was not abandoned by his residence at M.

[2. A family engaged by the owner and occupant of a farm to live in the house with him, and work the farm on shares, but subject to his management and control, are tenants under a special arrangement, and not relatives or dependents of the owner, and do not form part of or constitute the owner's family, within the meaning of the homestead exemption to heads of families, (1 Wag. St. Mo. pp. 603, 604, 697.)

[3. C., a bankrupt, was a bachelor, and from 1853 lived on a farm with a sister, who furnished money for its purchase and improvement. The brother and sister furnished money and labor in unequal proportions. Another sister, an invalid, formed part of the household until her death, in 1861. In 1869, the surviving sister married. In 1872, after her husband's death, she returned to the home of the bankrupt, and made it her home, having her furniture there; but, her health being poor, she visited much of the time in the east, and also with brothers in the neighborhood. In 1876, C. was declared a bankrupt, and afterwards the sister returned to the farm. She was in charge of the household and domestic affairs at the farm, and paid no board. *Held,* that she was part of the bankrupt's family, and that he was entitled to an exemption as the "head of a family," under the Missouri homestead exemption laws, (1 Wag. St. pp. 603, 604, 697,) and under the bankrupt act of March 2, 1867, (14 Stat. 517, c. 176.)]

In bankruptcy. This was a bill of review, seeking to reverse the decision of Judge Treat [upon the bankrupt act of March 2, 1867, (14 Stat. 517, c. 176,)] sustaining the bankrupt's exceptions to his assignee's report, refusing to set him off a one thousand five hundred dollar homestead and certain personalties amounting to five hundred dollars. The assignee's refusal was on the ground that the bankrupt was not a housekeeper or head of a family. The exceptions alleged that he was such a housekeeper when he filed his petition in bankruptcy. The issues were tried before United States Register Enos Clarke, who held that the bankrupt was not such a housekeeper, and overruled the exceptions. On application to Judge Treat to reverse the decision, he heard the same evidence that had been heard by Register Clarke, and held that the bankrupt was such head of a family, and sustained the exceptions. [Affirmed.]

Mr. Dudley C. Comings, the bankrupt, was a bachelor, and from 1852 or 1853, lived on a farm about twelve miles from Monroe City, on which the exemption is claimed, with a sister, who, from that date until the farm was paid for, furnished funds for its purchase and improvement, she and he furnished money and labor in unequal proportions. Another sister, an invalid, formed part of the household until her death, in 1861. In 1869, the surviving sister married and moved away, and remained away until her husband's death in 1870. In 1872, she returned to the home of bankrupt, which she made her home, and where she left her furniture and her room furnished. Her health being critical, she visited much of her time in the east, and also with her two brothers living at Monroe City. The bankrupt's health failing him, he also went to Monroe City, and lived or slept, ate, etc., with a brother, doing such work as he could in consideration for his board. When his health was recovered, he returned to the farm, and was living there when he filed his petition in bankruptcy. There was also another view relied on by the bankrupt. In 1871, the bankrupt becoming feeble, engaged a family (Algers) to come and live in the house with him, and operate or work the farm on a division of the crops, etc. They were all the time subject to his management and control, and were with bankrupt at the filing of this petition. It was complained that while at Monroe, the bankrupt once voted, and there was some evidence that he spoke of Monroe as his home, and that during his stay there he was nominated as a candidate for justice of the peace. It appeared, however, that he never authorized his name to be so used.

DILLON, Circuit Judge. The district court sustained the claim of the bankrupt to a homestead exemption under the Missouri statute on that subject. The assignee contests the correctness of this ruling and brings the case here for review. I have read the evidence contained in the record, covering over one hundred pages. The statute of Missouri gives to each housekeeper or head of a family resident in the county "his home-

stead used by him as such," to the extent of not over one hundred and sixty acres, and in value not over one thousand five hundred dollars. 1 Wag. St. pp. 603, 604, 697. Certain other limited exemptions are made to each "head of a family." If the bankrupt is entitled to a homestead, I am of opinion that that right was not abandoned by his residence at his brother's in Monroe City, he having left his property on the home farm, except his wearing apparel and a few tools, and having gone to Monroe City because of his feeble health, and to be with his brothers, and having resumed his usual residence on the farm in which the exemption is claimed, before filing the petition in bankruptcy. I am of opinion that if it was essential to maintain the bankrupt's claim to the exemption to hold that the Algers (who were tenants under a special arrangement, and not relatives or dependents of the bankrupt) were part of or constituted the bankrupt's family, that this position could not be sustained.

The bankrupt had never been married, and if he had any family, it was constituted of himself and his widowed sister, Mrs. Metcalf. Years before, when the farm was being opened and improved, two unmarried sisters lived with him and were then part of his family. One of these sisters died, the other married Mr. Metcalf, say about 1869. She resided with her husband until his death in 1870. She was without children. I infer she had very limited means. In 1872, she returned to the bankrupt's farm as her home, brought her household goods there, and managed his house and household affairs. She paid no board. She was quite advanced in years, her health was poor, and the work was too hard; and by the advice of her physician she went in 1873 to reside with her brothers (two of them living as one family) at Monroe City, about twelve miles distant. She always paid her board at her brothers in Monroe City. The bankrupt's health was also poor, and about the same time he left his farm with the Algers, and went to live with the same brothers at Monroe City, doing enough about the brothers' mill to equal the value of his board. In the spring of 1876, shortly before the bankruptcy, the bankrupt went back to the farm. The brothers who owned the mill at Monroe City failed. Mrs. Metcalf went east and did not return to the farm until after the bankruptcy.

If we regard the direct statements of the bankrupt and Mrs. Metcalf, as to their purposes and intentions, the homestead right exists. While the facts cloud or render somewhat doubtful these declared purposes and intentions, on the whole, I think the circumstances, the undisputed facts, show that the right exists. I am clear that the right, if it ever existed, was not abandoned by the bankrupt's residence at Monroe. The case turns upon the question whether Mrs. Metcalf was part of the bankrupt's family. She

lived there years before her marriage. It was her home prior to that event. After her husband's death she went there, and her brother received her as a member of his family, gave her a room, and she was in charge of his household and domestic affairs. She intended to remain there. She had no home of her own. Her household goods were there. She paid no board, and was not expected to. Her health failed, and she went, under the advice of her physician, to Monroe. Her relations to her brothers there were very different from her relations with her brother the bankrupt. Mrs. Metcalf says in her testimony that the bankrupt's house was regarded by her as her home, and she explains her absence therefrom by the condition of her health. The case is a close one, but under all the circumstances, I am of opinion that the district court was justified in regarding the bankrupt as a housekeeper or head of a family within the meaning of the Missouri statute, and its order in this respect is affirmed.