## In re OPAVA.

(District Court, N. D. Iowa, E. D.   October 5, 1916.)

1. EXEMPTIONS ⚖═21.—"HEAD OF FAMILY"—WHO ARE—PRIESTS—"FAMILY."
   A "family" is a collection of persons living under one roof, having one head or manager; and the "head of a family" is one who controls, supervises, and manages the affairs of the household.   Therefore, a priest of the Roman Catholic Church who induced his sister to come from a foreign country and live with him, agreeing to pay over to her all his income outside of his personal expenses, the sister to maintain the household and have any amount saved, is a "head of a family" within Code Iowa 1897, § 4008, making exemptions to the heads of families.

   [Ed. Note.—For other cases, see Exemptions, Cent. Dig. §§ 19, 23; Dec. Dig. ⚖═21.

   For other definitions, see Words and Phrases, First and Second Series, Family; Head of Family.]

2. BANKRUPTCY ⚖═413(4)—DISCHARGE—OBJECTIONS—SUFFICIENCY.
   A specification of objections to the discharge of a bankrupt on the ground that he had concealed property is insufficient, unless it charge the concealment was knowingly and fraudulently done.

   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 713, 714; Dec. Dig. ⚖═413(4).]

3. BANKRUPTCY ⚖═408(3)—DISCHARGE—REFUSAL.
   As Bankr. Act July 1, 1898, c. 541, 30 Stat. 544, provides that the bankrupt shall be discharged unless he has committed an offense punishable by imprisonment as provided, a bankrupt's discharge will not be denied on the ground that he knowingly and fraudulently concealed a typewriter, because he did not include such article in his schedule, where the typewriter, which was of small value, was never concealed but kept in the usual place in the bankrupt's library.

   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 735, 736; Dec. Dig. ⚖═408(3).]

4. BANKRUPTCY ⚖═413(4)—DISCHARGE—SPECIFICATION OF OBJECTIONS.
   Specification of objections to a bankrupt's discharge that he had concealed certain property which had previously been transferred to his sister, and in which he had a beneficial interest, is insufficient.

   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 713, 714; Dec. Dig. ⚖═413(4).]

5. MASTER AND SERVANT ⚖═3(1)—CONTRACTS—VALIDITY.
   A brother agreed that if his sister would live with him and manage his household he would deliver to her all his income beyond his personal expenses.   The sister agreed to pay out of such income the household expenses, the expenses of illness and of the brother's funeral; it being understood that she was to have any sum saved.   *Held*, that the contract was lawful.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 2; Dec. Dig. ⚖═3(1).]

6. BANKRUPTCY ⚖═408(4)—DISCHARGE—CONCEALMENT OF ASSETS.
   Where pursuant to contract a bankrupt paid his sister to manage his household his entire income beyond that necessary for his personal expenses, it being agreed the sister should have all savings, the bankrupt, who did not include in his schedules money saved by the sister, will not be denied a discharge on the ground of knowingly and fraudulently concealing assets, it appearing that on his first examination he fully disclosed his financial relations with his sister, for the bankrupt was justified in

proceeding on the theory that the contract was lawful and that he had no interest in the sister's savings.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 733–735; Dec. Dig. ☞408(4).]

7. BANKRUPTCY ☞408(1)—DISCHARGE—FALSE OATH.

Where a bankrupt, believing that under a contract he was not entitled to certain funds, did not include such funds in his schedules, he cannot, though he verified the schedules, be denied discharge on the ground of making false oath, as he was entitled to assume, if in good faith, that the contract was lawful and that he had no interest in the funds, and to make the schedules on that theory.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 732; Dec. Dig. ☞408(1).]

8. FRAUDULENT CONVEYANCES ☞51(2)—EXEMPT PROPERTY.

A debtor, the head of a family, whose wages are exempt by statute, may use his wages as he desires, the creditors having no right to object, though he gives them away or spends them foolishly.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 115; Dec. Dig. ☞51(2).]

9. BANKRUPTCY ☞409(1)—DISCHARGE—DENIAL.

Where the bankrupt had never kept books, his failure to keep books after incurring indebtedness is no ground for denying a discharge on the theory that he failed to keep books to conceal his true financial condition; it appearing that the bankrupt was a priest who received a small income and had no necessity for books.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 752–757; Dec. Dig. ☞409(1).]

In Bankruptcy. In the matter of the bankruptcy of Vincent Opava. Petition to review the action of the referee and denying claim to exemptions, together with objections to the discharge of the bankrupt. Order of referee declining to set apart exempt property reversed, and bankrupt ordered discharged.

Reed & Pergler, of Cresco, Iowa, for bankrupt.

Ramsey & Blackstone, of Garner, Iowa, for opposing creditor.

WADE, District Judge. The bankrupt is a priest of the Catholic Church, who filed a voluntary petition in bankruptcy, and now asks his discharge.

The debts owing by him, so far as indicated by the record before me, is $1,000, upon a note executed for some stock in an insolvent corporation and $65 to the publishers of "Americana."

Two questions are here presented. Early in the proceedings, the bankrupt claimed, as exempt to him as head of a family, his small library and typewriter. This claim was denied by the referee, and, by stipulation, a petition for review of the action of the referee is presented with the objections of the Farmers' National Bank of Garner to the discharge of the bankrupt.

First. As to the question of exemptions:

[1] The sole question here is whether or not the bankrupt is the head of a family within the meaning of Code of Iowa 1897, § 4008.

The claims made by the bankrupt that he is the head of a family is based upon the fact, which appears to be undisputed, that some

15 or 16 years ago the bankrupt, who had been ordained some 4 years, and who seems to have been a shining mark for promoters of corporations, with glowing prospects, but no assets, sent for his sister to Bohemia, and induced her to come and live with him, and, as inducement, made an agreement with her that he would turn over to her all his income outside of his expenses, for clothing, etc.; that she would maintain the household, and whatever was saved from his income should be her property, except that she was to furnish therefrom expenses of illness, and funeral expenses upon his death; all the balance she could save, was to belong to her.

Under this agreement, she came to him, and has lived with him some 15 years. His income, outside of small gifts, averaged about $750 per year. She has occupied the position of housekeeper and manager of household affairs, and under the contract the bankrupt is under obligation to continue this arrangement throughout his life. The bankrupt is performing the ordinary duties of his profession, and maintains a home at whatever place he is assigned to perform the duties of his ministry.

Under these circumstances, it is contended that the bankrupt is the head of a family within the meaning of the Code of Iowa, and, if so, there is no question but what he is entitled to the exemptions claimed.

Exemption statutes are liberally construed.

"In every court the administration of an exemption law should comport with the beneficent spirit that prompted its enactment. A court of equity * * * should not attempt to defeat an exemption by niceties in practice. It should be helpful to those whose condition requires them to invoke it." Smith v. Thompson (8th Cir.) 213 Fed. 335, 129 C. C. A. 637.

A most comprehensive definition of a "family" is that by Judge Deemer in Blair v. Fritz, 162 Iowa, 716, 144 N. W. 611.

"A 'family' is a collection of persons living under one roof, having one head or management; and the 'head of a family' is the one who controls, supervises, and manages the affairs of the household. Fullerton v. Sherrill, 114 Iowa, 511, 87 N. W. 419; Emerson v. Leonard, 96 Iowa, 311, 65 N. W. 153, 59 Am. St. Rep. 372; Tyson v. Reynolds, 52 Iowa, 431, 3 N. W. 469. The relation existing among the group must be of a permanent and domestic character."

"A family 'is a collective body of persons who live in one house, and under one head or manager.'" Arnold v. Waltz, 53 Iowa, 706, 6 N. W. 40, 36 Am. Rep. 248.

"The number of persons thus living together is not at all important, except that there must be more than one, as it is quite certain that two persons may constitute a family." Moyer v. Drummond, 32 S. C. 165, 10 S. E. 952, L. R. A. 747, 17 Am. St. Rep. 850.

In Parsons v. Livingston, 11 Iowa, 104, 77 Am. Dec. 135, a widower having his mother living with him, and supported by him, was held to be the head of a family.

A man who has living with him his widowed sister and her children is the head of a family. Wade v. Jones, 20 Mo. 75, 61 Am. Dec. 584.

A man who has living with him his invalid sister, and who supports her, though his sister owns the property on which they live, is the head of a family. Moyer v. Drummond, supra.

A bachelor living on a farm, with whom a widowed sister lives, having her furniture there, and paying no board, is the head of a family. Bailey v. Comings, 2 Fed. Cas. 367.

A man who has living with him his invalid brother and his wife is the head of a family. Webster v. McGauvran, 8 N. D. 274, 78 N. W. 80.

A man who keeps house, and "has living with him, and is supporting, some persons whom it is either his legal or moral duty to support," is the head of a family. In re Morrison (D. C.) 110 Fed. 734.

An unmarried woman having living with her an invalid sister dependent upon her is the head of a family. Chamberlain v. Brown, 33 S. C. 597, 11 S. E. 439.

An unmarried woman having living with her two children of a deceased sister is the head of a family. Arnold v. Waltz, supra.

An unmarried woman supporting relatives whom she is under moral obligation to care for is the head of a family. American National Bank v. Cruger, 31 Tex. Civ. App. 17, 71 S. W. 784.

A man is head of a family "if he contributes in part to the support of those who have a moral, though not a legal claim on him, or if he controls, supervises, and manages the affairs of the household." Forbes v. Groves, 134 Mo. App. 729, 115 S. W. 451.

Numerous other illustrations might be presented, but they are all summed up in the statement that a "family" is a collection of persons, two or more, living under one roof, having one head, or management, and that the "head of a family" is the one who controls, supervises, and manages the affairs of the household. As Judge Deemer says, the existence of "the group must be of a permanent and domestic character."

Applying this test, and the rules announced in the foregoing cases, to the facts in the record in this case, there can be no question but that the bankrupt is the head of a family. He maintains a home; he is the wage-earner, so to speak; he is the manager, so far as the maintenance of the home is concerned; he is under moral obligation to his sister; he is under a legal obligation to her by virtue of the contract which he made to maintain her during her life. There is no question but what she could enforce this obligation in case of his failure. If she became an invalid, and unable to work, it would be his duty, morally and legally, to support her. The relations of himself and sister are permanent. It is her home now and in the future.

The purpose behind the enactment of exemption laws is to secure some measure of protection to those to whom a man may owe a legal or moral obligation to furnish a living, in case misfortune or insolvency should come; and, within the spirit and purpose of this law, the bankrupt herein is clearly entitled to the benefits which the law provides.

So that the order of the referee, declining to set apart exempt property to the bankrupt, is reversed.

Now, as to the objections to the discharge of bankrupt:

[2] The first objection is that the bankrupt concealed from the trustee a certain typewriter, alleged to be of the value of $50, but which, the record discloses, cost originally about $45. This objection is clearly

insufficiently stated. It is nowhere charged that such concealment was "knowingly and fraudulently" done, and, under the statute, a specification of objection to discharge upon this ground which does not charge that it was knowingly and fraudulently done is insufficient. In re Taplin (D. C.) 135 Fed. 861. The second specification against the bankrupt in opposition to discharge is that the bankrupt concealed from his trustee "certain property and money, the exact amount of which" cannot be stated. This specification is clearly insufficient for the same reason; there is no suggestion that it was done knowingly and fraudulently.

The next specification is that the "bankrupt made a false oath in relation to the said proceedings in bankruptcy." But this fails to charge that the same was knowingly or fraudulently done, and is clearly insufficient.

The final specification is that the bankrupt, "with intent to conceal his financial condition, failed to keep books of account," etc.

While the specifications are almost entirely insufficient to comply with the statute, a consideration of the same, if properly pleaded, could lead to but one result.

[3] As to the typewriter: The only indication of an attempt to conceal it was the failure to enter it in the schedules; but the law does not punish a mere failure to enter property in the schedules. The statute is specific that:

"The judge shall discharge the applicant unless he has committed an offense punishable by imprisonment as herein provided."

And unless the evidence is such as to convince the court that the bankrupt was guilty of a crime for which he should be imprisoned, the charge cannot be sustained. There is not a scintilla of evidence to indicate that the bankrupt "knowingly and fraudulently" concealed this typewriter. The evidence shows it cost $45, some time ago. It is probably not worth more than half that now, and it would take strong evidence to convince a court that a man had the fraudulent purpose which would warrant a penitentiary sentence, simply because he failed to put it in the schedule.

Experience in these bankruptcy matters shows that, in many cases, small articles are omitted in making up schedules. This typewriter was never concealed; it was right there in the library where it always had been, and no attempt was made to prevent the trustee or the attorney from seeing it. There is nothing in this to justify a refusal to discharge. In re McCann (D. C.) 179 Fed. 575; In re Doyle (D. C.) 199 Fed. 247; In re De Mauriac (D. C.) 206 Fed. 358; In re Stafford (D. C.) 226 Fed. 127.

[4] As to the specifications that the bankrupt concealed certain property, which before that time had been transferred to his sister "in which he had a beneficial interest," it is clearly insufficient, but, if sufficient, is not sustained by the evidence.

[5, 6] On his first examination the bankrupt fully disclosed his financial relations with his sister. He states a contract which he had a right to make, by which he agreed to, and under which he did, turn

over to his sister his income, from which the household expenses were to be paid, and the balance of which was to belong to her, outside of funeral expenses. If this contract was made, it was his duty to turn over this money, and, whether he did or not, it belonged to her in equity.

The proceeding before me does not involve any question of fraud against creditors, or anything of that kind; it is not even necessary that the court should determine the absolute legality of the transaction. In order to defeat a discharge as above stated, the concealment must be knowingly and fraudulently made. If a man in good faith believes that under a certain transaction he has lost all interest in the property which was formerly his, he has the right to stand upon that belief in making his schedules, and his failure to enter the transaction cannot be held to be a fraudulent concealment. No court would hold that under such circumstances he, within the language of the statute, "has committed an offense punishable by imprisonment."

It is true that the evidence shows that the sister had saved $4,000 or $5,000 out of the income, but, if the contract made with her is a valid contract, it belongs to her; and, whether a valid contract or not, the bankrupt had a right, if he did so in good faith, to proceed upon the theory that it was a valid contract, and that she was the legal owner of such accumulations.

[7, 8] The further specification against discharge, that the bankrupt made false oath, because he verified the petition in bankruptcy and schedules without including the property given to his sister as aforesaid, comes within the same rules.

In Re Hennebry (D. C.) 207 Fed. 882, Judge Reed of this district says:

"The evidence as to the alleged fraudulent transfer of property by the bankrupt in fraud of creditors is alone that given by him in his examination at the first meeting of creditors. That examination fails to disclose any attempt upon his part to evade any question as to such transfers, or to conceal from his creditors or the trustee any of the property alleged to have been so transferred, and his statements in regard thereto seem to be full and frank. It cannot therefore rightly be said that there was any concealment of the property so transferred, other than the fact that it was not listed in his schedules, and the trustee and his creditors were then advised by him of the property so transferred, when and how he acquired the same, the purpose of the transfer, and the consideration he received therefor; so that, if it was in fact a fraudulent transfer, the trustee and creditors were then given full information by him in regard thereto, which would enable the trustee to recover the same if he, at his own instance, or at the instance of the creditors, felt disposed to make the attempt.

"The omission of the property from the bankrupt's schedules alleged to have been so transferred may, in connection with other evidence of a fraudulent concealment of such property, be considered in determining whether or not there has been an intentional fraudulent concealment by the bankrupt of property to hinder, delay, and defraud his creditors; but the omission alone from the schedules of such property, especially when transferred more than four months before the bankruptcy, is not, it seems to me, the offense contemplated by section 29b(1) or 29b(2) of the Bankruptcy Act; but the offenses so denounced are concealments of property within the four months preceding the bankruptcy and false oaths in bankruptcy proceedings, other than mere omissions of such property from the schedules, and contemplate the concealment of property by some other act or acts upon the part of the bankrupt than merely

omitting it from the schedules, and affirmative false statements of some material fact or facts by the bankrupt in a proceeding in bankruptcy, willfully and intentionally made by him, knowing the same to be false."

Judge Reed further says, in this case:

"Nor is the verification by the bankrupt of the schedules from which property so transferred is omitted the making of a false oath within the meaning of the bankruptcy act; for, as before stated, the bankrupt is not the owner of, has no interest in, and is not entitled in his own name or right to recover, such property. The provision of the bankruptcy act that the trustee may recover such property, if in fact it has been so transferred, has the effect of restoring it to the bankrupt estate for the benefit of the creditors, and this seems to be all that is contemplated by Congress as to property so transferred in fraud of creditors."

In Re Buchanan, 219 Fed. 492, 135 C. C. A. 204, the Court of Appeals of the Second Circuit says:

"As to the first of these objections, there is nothing as yet to show what the amount of the alleged surplus is, or indeed that there is any surplus. Moreover, as stated above, it is still an open question whether or not such surplus, if there be one, passed to the trustee. Presumably the bankrupt was advised by his counsel that it did not so pass, and a majority of the creditors in number and amount, also presumably advised by counsel, have reached the conclusion that the chance of an affirmative answer to the question was too uncertain to risk spending the funds of the estate in securing a judicial answer to it. Under these circumstances, it would be a very harsh construction of the bankruptcy act to refuse discharge because the bankrupt did not include this trust income in his schedules."

The record does not disclose whether the trustee or the creditors have sufficient faith in the contention that the bankrupt has an interest in the property held by his sister, to bring action against her to have the matter determined. In any event, there was nothing done by the bankrupt to impede such a proceeding, and, if he in good faith believed that she could defend her title in court in a proper proceeding, he had a right to make his schedules on that belief. He could justly have proceeded upon the theory announced in Sternberg v. Levy, 159 Mo. 617, 60 S. W. 1114, 53 L. R. A. 438; that, being the head of a family, he had a right to do as he pleased with his income, at least such of it as accumulated within 90 days—it would be exempt to him.

In this case it is said, relating to the question of exemptions:

"This contention is based upon the theory that it is not the duty of a brother to support his widowed sister and her children; but, while it is not his duty, he has a right to do so, and, if he resides with them and provides for them, he is the head of a family and entitled to the same exemptions as if he had a wife living with him. * * * But if a man is entitled to his salary and certain exemptions as the head of a family which his creditors cannot touch, and if he chooses to spend a part of his salary in premiums for life insurance for the benefit of his family after he is gone, his creditors are not thereby defrauded, for he has withdrawn no part of his property which his creditors could touch. * * * Hence it is no fraud for a brother who is the head of a family, composed of himself and his sister and her children, to apply his wages or his exempt property to the procuring of insurance for her benefit; for his creditors cannot touch the wages or property and have no right to complain if he uses it thus providently and properly instead of wasting it."

235 F.—50

The court further says:

"What is said in the plaintiff's interplea as to the amount contributed by Joseph Levy to his sister being $5,500 in excess of what he could have procured similar board for elsewhere is of no consequence. The laws of our country give no court power to determine how much a man may spend for board, nor to inquire whether he paid too much or too little therefor."

The rule announced in this case is supported by other authorities to the effect that, where a man is the head of a family, his creditors have no interest in his wages (except under the Iowa Code accumulations of earnings of more than 90 days next preceding the levy), and that he can do with them as he pleases, buy gifts if he chooses, and that no charge of attempt to defraud creditors can be based thereon. However this may be, the transactions of the bankrupt with his sister were such that he would have a right in good faith to proceed in this bankruptcy proceeding upon the theory that he had no interest in the accumulations of his sister, and leave the trustee and creditors to take such steps as they might deem advisable to test the matter in the proper court where his sister would be a party.

[9] The specification, charging failure to keep books from which his true financial condition might be ascertained, is without merit. No law requires a man to keep books.

"It is a matter of common knowledge that a large proportion of the people do not keep books at all; for example, farmers, clerks, and mechanics. But this is either because they see no need for it, or else cannot do it satisfactorily." In re Brockman (D. C.) 168 Fed. 1015; In re Hindin (D. C.) 219 Fed. 605.

And the failure to keep books does not bar discharge; it is only when the failure to keep books is with the specific intent thereby to conceal his financial condition that a discharge can be denied.

"The intent must be shown to the satisfaction of the court to bring the case within the statute, and it would be a harsh and unjust construction to say that the intent must, as a matter of law, be presumed from mere bad bookkeeping or from a mere failure to keep books. If that were the law, probably nine out of every ten country people, and a very large proportion of plain people everywhere, would be refused discharges if applied for, inasmuch as few of them can keep books which are intelligible to anybody except themselves." In re Brockman, supra.

The bankrupt in this case was not in any position which required the keeping of books. There is no claim that he ever kept books, and there was no occasion, so far as the record discloses, to conceal his financial transactions—certainly none until the execution of the Colby note for $1,000, which is practically all his indebtedness. This note appears to have been executed but a comparatively short time previous to the bankruptcy, and there is nothing to show any change in the methods of the bankrupt with reference to bookkeeping from what his usual course had been throughout his whole professional life.

The objections to the discharge are overruled, and the bankrupt will be discharged as prayed.

Counsel for bankrupt will prepare the record entry, and submit to counsel for trustee, who will have ten days in which to file objections to the form thereof; said decree to reserve proper exceptions.